CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

NOV 3 0 2018

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

LINDA E. CARR,                    )
                                  )
        Plaintiff,                )        Civil Action No. 7:17CV00420
                                  )
v.                                )        **MEMORANDUM OPINION**
                                  )
NANCY A. BERRYHILL, Acting        )        By: Hon. Glen E. Conrad
Commissioner of Social Security,  )        Senior United States District Judge
                                  )
        Defendant.                )

Plaintiff has filed this action challenging the final decision of the Commissioner of Social Security denying plaintiff's claim for a period of disability and disability insurance benefits under the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423. Jurisdiction of this court is established pursuant to 42 U.S.C. § 405(g). This court's review is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that plaintiff failed to meet the requirements for entitlement to benefits under the Act. If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). Stated briefly, substantial evidence has been defined as such relevant evidence, considering the record as a whole, as might be found adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971).

The plaintiff, Linda E. Carr, was born on May 3, 1961, and eventually completed the tenth grade in school. Ms. Carr has been employed as a cashier and kitchen helper. She last worked on a regular and sustained basis in 2006. On October 2, 2013, Ms. Carr filed an application for a period of disability and disability insurance benefits. In filing her current claim, Ms. Carr alleged that she became disabled for all forms of substantial gainful employment on June 30, 2006, due to

pain in her back and right shoulder, numbness and weakness in her toes and right hand, fibromyalgia, irritable bowel syndrome, memory problems, depression, and anxiety. (Tr. 216). Ms. Carr now maintains that she has remained disabled to the present time. The record reveals that Ms. Carr met the insured status requirements of the Act through the fourth quarter of 2010, but not thereafter. See generally 42 U.S.C. §§ 416(i) and 423(a). Consequently, plaintiff is entitled to a period of disability and disability insurance benefits only if she has established that she became disabled for all forms of substantial gainful employment on or before her date last insured, December 31, 2010.

Ms. Carr's application was denied upon initial consideration and reconsideration. She then requested and received a de novo hearing and review before an Administrative Law Judge. In an opinion dated August 19, 2016, the Law Judge also determined, after applying the five-step sequential evaluation process, that Ms. Carr was not disabled on or before her date last insured.[1] See 20 C.F.R. § 404.1520. The Law Judge found that Ms. Carr suffered from several severe impairments through that date, including lumbar spine degenerative disc disease, degenerative joint disease of the shoulder, gall stones, irritable bowel syndrome, obesity, anxiety disorder, and depressive disorder, but that these impairments did not, either individually or in combination, meet or medically equal the requirements of a listed impairment. (Tr. 17–18). The Law Judge then assessed Ms. Carr's residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except the claimant could occasionally kneel,

---

[1] The process requires the Law Judge to consider, in sequence, whether a claimant: (1) has engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and (5) if not, whether she can perform other work in the national economy. 20 C.F.R. § 404.1520. If a decision can be reached at any step in the sequential evaluation process, further evaluation is unnecessary. Id.

crawl, crouch, stoop, or climb ramps and stairs. She could not climb ladders, ropes, and scaffolds. She should have avoided exposure to workplace hazards, such as hazardous machinery and unprotected heights. She could perform simple, routine tasks of no more than four steps. She could occasionally interact with the public.

(Tr. 21). Given such a residual functional capacity, and after considering testimony from a vocational expert, the Law Judge determined that Ms. Carr was unable to perform any past relevant work through the date last insured. (Tr. 23). However, the Law Judge found that she retained the capacity to perform other work roles existing in significant number in the national economy. (Tr. 27). Accordingly, the Law Judge concluded that Ms. Carr was not disabled at any time from the alleged onset date through the date last insured, and that she is not entitled to a period of disability or disability insurance benefits. See 20 C.F.R. § 404.1520(g). The Law Judge's opinion was adopted as the final decision of the Commissioner by the Social Security Administration's Appeals Council. Having exhausted all available administrative remedies, Ms. Carr has now appealed to this court.

While plaintiff may be disabled for certain forms of employment, the crucial factual determination is whether plaintiff was disabled for all forms of substantial gainful employment. See 42 U.S.C. § 423(d)(2). There are four elements of proof which must be considered in making such an analysis. These elements are summarized as follows: (1) objective medical facts and clinical findings; (2) the opinions and conclusions of treating physicians; (3) subjective evidence of physical manifestations of impairments, as described through a claimant's testimony; and (4) the claimant's education, vocational history, residual skills, and age. Vitek v. Finch, 438 F.2d 1157, 1159-60 (4th Cir. 1971); Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962).

After a review of the record in this case, the court is constrained to conclude that the Commissioner's final decision is supported by substantial evidence. The Law Judge's opinion

reflects a throughout evaluation of Ms. Carr's medical problems and the extent to which they affected her ability to work. Although Ms. Carr suffered from a combination of physical and emotional impairments, substantial evidence supports the Law Judge's determination that she retained the residual functional capacity to perform a limited range of light work through her date last insured.

The record reflects that Ms. Carr presented to Carilion Clinic with complaints of back and hip pain in November of 2005, prior to her alleged onset date. (Tr. 295). She was examined by Dr. Dallas Crickenberger, an orthopedic specialist. During the examination, plaintiff reported that the pain was worse after standing for her job as a cashier, and that cortisone injections provided by her primary care physician, Dr. David Cummings, provided pain relief for approximately two months. Plaintiff indicated that she had been stressed because of the pain and that she was taking Lortab and Xanax for "her nerves." (Tr. 295). Plaintiff advised Dr. Crickenberger that she wanted to be able to "work a little bit more in terms of standing time" and increase her time mowing the lawn from "1-2 hours to 2-4 hours because her lawn is about 10 acres" in size. (Tr. 295). On physical examination, Ms. Carr exhibited some tenderness to palpitation in the left hip and paralumbar area, but her motor strength, sensation, and reflexes were normal. X-rays of plaintiff's left hip revealed "good joint space," "no spurs," and "no destructive changes." (Tr. 296). Lumbar spine x-rays showed mild degenerative changes and spondylosis at L3-4. (Tr. 310–11). The remainder of the lumbar spine appeared "essentially unremarkable." (Tr. 311).

Ms. Carr saw Dr. Cummings on several occasions in 2006. While few treatment notes were compiled, it was indicated that plaintiff complained of back and hip pain in October and December. Dr. Cummings continued plaintiff on Lortab and Xanax. (Tr. 396).

In April of 2007, plaintiff presented to Dr. John Hagy with complaints of abdominal pain and intermittent rectal bleeding. (Tr. 301). She was noted to be obese, but her physical examination was otherwise normal with no signs of tenderness in her back or lower extremities. (Tr. 302–03). An abdominal CT scan revealed the presence of gallstones but was "otherwise unremarkable." (Tr. 312). Dr. Hagy recommended that plaintiff undergo a colonoscopy. (Tr. 301–02). He refilled plaintiff's prescriptions for Lortab and Xanax, and started her on Prevacid. (Tr. 303).

In April of 2008, Ms. Carr was taken by ambulance to Carilion Franklin Memorial Hospital from a local funeral home. (Tr. 257). Plaintiff reported that her brother-in-law had just passed away, and that she had experienced hyperventilation and dizziness. She was given Ativan and released a few hours later. The attending physician's diagnostic impression included "grief reaction" and "panic attack." (Tr. 257).

In August of 2008, Ms. Carr returned to the emergency room and reported that she had experienced a panic attack the previous day while eating. (Tr. 263). She indicated that it felt like food would not go down her throat. (Tr. 263). Plaintiff acknowledged that this had "only happened twice" and that she was no longer having difficulty swallowing. (Tr. 263). On physical examination, there was no airway obstruction, back tenderness, neck tenderness, or edema in her extremities. She was diagnosed with an "anxiety reaction" and prescribed Xanax and Prilosec. (Tr. 263).

In December of 2008, Ms. Carr presented to the emergency room with complaints of abdominal pain and diarrhea. (Tr. 270). Aside from exhibiting mild abdominal tenderness, her physical examination was normal and she walked with a steady gait. (Tr. 270-76). The

attending physician noted that she was probably experiencing biliary colic. (Tr. 273). He referred her for an elective cholecystectomy.

In August of 2009, plaintiff presented to Dr. Crickenberger with complaints of knee pain. Dr. Crickenberger ordered a three-view x-ray series of plaintiff's left knee. The results of the series were "negative . . . for an acute osseous abnormality." (Tr. 313).

Plaintiff saw Dr. Crickenberger again in October of 2010, at which time she complained of pain in her right shoulder and left hip. (Tr. 314–15). A November 2010 x-ray of plaintiff's shoulder revealed no evidence of any abnormality. (Tr. 314). An x-ray of her hip revealed "early osteoarthritic changes of the superior acetublar rim," but "no other abnormalities as imaged." (Tr. 315).

Dr. Crickenberger referred plaintiff to Dr. John Fraser with Carilion Clinic Neurosurgery – Roanoke. On November 4, 2010, Dr. Fraser ordered x-rays of plaintiff's lumbar spine, which revealed interspace narrowing and endplate osteophytes at the L3-L4 level. (Tr. 316). A few days later, Ms. Carr saw Dr. Fraser for a consultative evaluation regarding her left-sided lower back pain. (Tr. 308). Plaintiff reported that her pain was accompanied by numbness at times, and that her legs felt heavy when she walked. Dr. Fraser noted that plaintiff was under a fair amount of stress, that her husband was disabled, and that she was in the process of obtaining custody of her grandchild. On physical examination, plaintiff moved slowly, but was capable of walking on her heels and toes without asymmetry. She exhibited "sensory loss in an S1 distribution," but the straight leg raising test was negative, her reflexes were symmetrical, and Dr. Fraser did "not find any weakness of the extensor hallicis longus on either side." (Tr. 308). Dr. Fraser prescribed a Medrol Dosepak and instructed plaintiff to perform lumbar exercises. He also requested additional diagnostic imaging, including myelography. A subsequent myelogram

conducted on December 7, 2010 demonstrated moderate spinal canal stenosis at L3-L4 and spinal stenosis to a lesser degree at L4-L5. (Tr. 317). The examination also revealed a small central protrusion at L5-S1 and moderately advanced facet arthropathy on the left L5-S1. (Tr. 317).

Ms. Carr returned to Dr. Fraser on January 28, 2011, after her insured status expired. During the examination, plaintiff indicated that her symptoms of pain and numbness had "gotten worse since the myelogram," and that most of her leg pain occurred when she slept on her side. (Tr. 320). Dr. Fraser discussed the possibility of decompressive surgery, noting that plaintiff's history was "less than a clear-cut picture for neurogenic claudication or radiculopathy," but that he would not refuse to perform surgery if she wanted to pursue it. (Tr. 321). At that time, it was "not clear that [plaintiff was] really interested in surgery." (Tr. 321).

During a follow-up appointment on March 24, 2011, plaintiff reported that her left leg numbness had increased and that her entire left leg would go numb with sitting. (Tr. 455). In light of her "persistent and progressive symptoms," plaintiff decided to proceed with decompressive surgery. (Tr. 455). On April 6, 2011, plaintiff underwent an L3-4 bilateral laminectomy, medial facetectomy, and foraminotomy at Carilion Roanoke Memorial Hospital. She tolerated the procedure well and was released the following day. (Tr. 458).

Plaintiff returned to Dr. Fraser approximately five weeks later. In a letter to Dr. Crickenberger summarizing the follow-up examination, Dr. Fraser noted that Ms. Carr was still experiencing "some low back pain." (Tr. 322). However, she was able to walk on her heels and toes, she could perform knee bends well with both legs, her reflexes were symmetrical, and Dr. Fraser could find "no deficit." (Tr. 322). Dr. Fraser noted that he had prescribed physical therapy, Ultram, and Lodine, and that he would see plaintiff again in six weeks.

On December 6, 2011, plaintiff presented to Dr. Brent Johnson, an orthopedic surgeon, with complaints of right shoulder pain. X-rays performed that day revealed "Type 2 acromion." (Tr. 328). Plaintiff elected to proceed with a steroid injection. Approximately seven months later, in August of 2012, plaintiff continued to complain of shoulder pain. (Tr. 337). At that time, she was caring for her disabled husband and had custody of her two-year-old grandson. She ultimately underwent arthroscopic surgery on her right shoulder on December 26, 2012.

In September of 2013, Ms. Carr returned to Dr. Fraser with complaints of back pain. However, on physical examination, her back was "nontender," her gait was only mildly antalgic, her straight leg raising test was negative, and she had full motor strength, intact sensation, and no edema. (Tr. 421). Based on subsequent diagnostic testing and evaluations, Dr. Fraser opined that plaintiff's more recent symptoms were "mostly osteoarthritic rather than related to actual stenosis." (Tr. 434). Dr. Fraser advised plaintiff to increase the amount of time that she was walking in her yard and to continue performing exercises.

At the administrative hearing held on July 12, 2016, Ms. Carr testified that she stopped working as a cashier because of back pain, and that the surgery performed by Dr. Fraser "actually made the pain worse." (Tr. 44, 46). Plaintiff also claimed that she was unable to do any household chores from the time she stopped working in 2006 until the end of 2010, when her insured status expired. (Tr. 51). Plaintiff estimated that she could only stand for approximately twenty minutes before needing to lie down in a recliner, and that she could sit for no more than fifteen minutes at a time. (Tr. 47–49). Ms. Carr further testified that she "gave up" mowing the lawn with a riding mower "a couple years ago," and that she had previously used a push mower to cut "a little bit at the back door." (Tr. 51–53). Ms. Carr claimed that when she used the push mower, she had to take breaks every twenty minutes. (Tr. 55). In response to questions from her

attorney, Ms. Carr also testified that she experienced difficulties with anxiety, depression, stomach cramping, and diarrhea at the time she stopped working. (Tr. 58–63). When asked about any hobbies that she had during the relevant time period, Ms. Carr testified that she would watch television and read home magazines. (Tr. 79). She also indicated that she enjoyed going to church with her mother-in-law. (Tr. 74).

After considering all of the evidence of record, the Law Judge determined that Ms. Carr's physical impairments were not so severe as to prevent performance of lighter forms of work activity through her date last insured. In making this determination, the Law Judge found that Ms. Carr's allegations of totally disabling physical limitations during the relevant time period were not entirely credible. The Law Judge noted that although plaintiff sought treatment for back pain, joint pain, and irritable bowel syndrome prior to the expiration of her insured status, the treatment she received was "essentially routine and/or conservative in nature" and plaintiff did not submit evidence of "significant treatment from specialists . . . before the date last insured." (Tr. 25). Although plaintiff ultimately underwent decompressive surgery in April of 2011, the Law Judge noted that plaintiff's symptoms appeared to worsen during the intervening time period, and that lumbar spine imaging showed only mild abnormalities until the month before her date last insured. (Tr. 25–26). The Law Judge further observed that plaintiff had normal physical examinations during the relevant time period, that she often made no mention of back pain, and that her ability to mow the lawn suggested that her symptoms were not so severe as to preclude a limited range of light work activity. (Tr. 26). Additionally, the Law Judge emphasized that none of plaintiff's treating physicians suggested that she was unable to work during the relevant time period. (Tr. 27).

9

The Law Judge also found that Ms. Carr's symptoms of anxiety and depression did not render her disabled for all forms of substantial gainful employment or otherwise contribute to an overall disability.[2] In evaluating her mental impairments at step three of the sequential process, the Law Judge determined that Ms. Carr had "moderate difficulties" with social functioning. (Tr. 20). Although plaintiff testified that she does not like to be around people, the Law Judge noted that she "did not complain of difficulty with social interaction to her treating practitioners," and that she "lived with her family members and went to church with no problems in social functioning." (Tr. 20). The Law Judge also determined that Ms. Carr had "moderate difficulties" in the area of concentration, persistence, or pace, based on her testimony indicating that "she does not deal [with] stress well due to anxiety." (Tr. 20). However, the Law Judge emphasized that plaintiff did not report specific problems with concentration, persistence, or pace during medical examinations; that her treating practitioners never noted mental status abnormalities; and that the fact that she enjoyed reading magazines suggested that she did not have significant problems with attention or concentration. (Tr. 20, 26). The Law Judge also noted that none of Ms. Carr's treating physicians suggested that she had functional limitations resulting from her mental health symptoms. (Tr. 27).

On appeal to this court, Ms. Carr, through counsel, makes three arguments in support of her motion for summary judgment. First, Ms. Carr argues that the Law Judge's assessment of her mental impairments is not supported by substantial evidence. Citing a variety of decisions, most notably that of the United States Court of Appeals for the Fourth Circuit in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), plaintiff argues that the Law Judge's findings regarding her residual

---

[2] In determining that plaintiff suffered from anxiety and depression through the date last insured and that such disorders constituted severe impairments, the Law Judge declined to adopt the opinions of the state agency consultants, who found that there was insufficient evidence to substantiate the presence of a medically determinable mental impairment.

functional capacity ("RFC"), and the corresponding hypothetical question posed to the vocational expert, did not sufficiently accommodate her moderate difficulties with concentration, persistence, pace, and social functioning. For the following reasons, however, the court is unable to agree.

In Mascio, the Law Judge credited Mascio's diagnosis of an adjustment disorder and also found that she had moderate difficulties with maintaining concentration, persistence, or pace as a side effect of her pain medication. Id. at 638. Although the hypothetical posed to the vocational expert "said nothing about Mascio's mental limitations," the vocational expert included an "unsolicited addition of 'unskilled work,'" which "matched the ALJ's findings regarding Mascio's residual functional capacity." Id. The Fourth Circuit ultimately "agree[d] with other circuits that the ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). The Court reasoned that "the ability to perform simple tasks differs from the ability to stay on task." Id. Because the Law Judge failed to explain "why Mascio's moderate limitation in concentration, persistence and pace at step three [did] not translate into a limitation in Mascio's residual functional capacity," the Fourth Circuit concluded that a remand was required. Id.

Upon review of the record, the court concludes that the Law Judge's assessment of Ms. Carr's mental impairments is supported by substantial evidence and that remand is not required under Mascio. As indicated above, the Law Judge partially credited the plaintiff's testimony that she sometimes avoids being around people in determining that her anxiety resulted in moderate difficulties with social functioning. (Tr. 20). Likewise, in determining that Ms. Carr had moderate difficulties with concentration, persistence, or pace, the Law Judge took into account plaintiff's testimony that she did not handle stress very well. (Tr. 20). After considering

plaintiff's particular difficulties in these areas of functioning, the Law Judge found that plaintiff was limited to performing "simple, routine tasks of no more than four steps," with only occasional interaction with the public. (Tr. 21). The Law Judge found that such restrictions adequately accommodated her issues with stress and anxiety, and that the record as a whole indicated that she did not require additional work-related limitations. (Tr. 20, 25–26). As noted above, the Law Judge emphasized that plaintiff's medical records did not document any mental status abnormalities or suggest that functional restrictions were necessary as a result of her emotional impairments.

Thus, unlike Mascio, the Law Judge did not summarily limit Ms. Carr to unskilled work without explanation. Instead, the Law Judge formulated specific limitations that he found would sufficiently accommodate plaintiff's particular difficulties with social interaction and with concentration, persistence, or pace. The court is satisfied that the Law Judge provided an adequate explanation of how his RFC findings fully accounted for Ms. Carr's stress or anxiety-related limitations, and that his assessment is supported by substantial evidence. The simple fact is that Ms. Carr received routine and/or conservative treatment for depression and anxiety, both before and after her date last insured, and that no practitioner has ever suggested that she has an emotional impairment that results in more significant functional limitations than those identified by the Law Judge. For all of these reasons, the court concludes that remand is not required under Mascio.

Ms. Carr's second argument is that the Law Judge failed to conduct a proper function-by-function analysis assessing her residual functional capacity. In particular, Ms. Carr contends that the Law Judge failed to make sufficient findings regarding her alleged "inability to

stand for more than twenty minutes at a time and sit for more than 15 minutes at a time and her need to recline in her recliner multiple times per day." Pl.'s Br. 22, Dkt. No. 18.

Upon review of the record and applicable caselaw, the court finds this argument unpersuasive. Although guidelines from the Social Security Administration instruct the Law Judge to take a "function-by-function" approach to determining a claimant's residual functional capacity, SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996), the Fourth Circuit has "rejected a per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis." Mascio, 780 F.3d at 635. Instead, the Court agreed with the Second Circuit that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Id. (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

Upon review of the record, the court concludes that such deficiencies are not present in the instant case. It is clear from the Law Judge's decision that he considered all of Ms. Carr's claimed limitations, including those described during the administrative hearing, but found that such limitations were inconsistent with the findings on physical examination, the conservative nature of the treatment provided prior to her date last insured, and her own statements to practitioners during the relevant time period. (Tr. 25–26). Although plaintiff underwent decompressive surgery a few months after her insured status expired, the record indicates that plaintiff's symptoms worsened during the intervening time period. Prior to the conduct of the surgical procedure in April of 2011, Dr. Fraser noted that plaintiff's symptoms had "gotten worse since the myelogram" conducted in December of 2010 and that she had elected to proceed with surgery in light of her progressive symptoms. (Tr. 320, 455). To the extent plaintiff now suggests that she wanted to

undergo surgery sooner but was unable to schedule it until after her date last insured, the record simply fails to support such argument. After seeing Ms. Carr on January 28, 2011, nearly a month after her insured status expired, Dr. Fraser advised Dr. Crickenberger that it was "not clear that [Ms. Carr was] really interested in surgery." (Tr. 320). The record indicates that it was not until a subsequent evaluation on March 24, 2011, when plaintiff "reported that her left leg numbness had increased," that plaintiff "requested that [they] proceed" with surgery.[3] (Tr. 455). Moreover, five weeks after the surgery was performed, plaintiff was able to walk and bend her knees well, and Dr. Fraser was unable to find any deficit on physical examination. (Tr. 322). For all of these reasons, the court believes that the Law Judge's evaluation of Ms. Carr's claimed limitations is consistent with the protocol established in Mascio and Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016), and that substantial evidence supports the Law Judge's evaluation of plaintiff's residual functional capacity through the date last insured.

Finally, relying on the Fourth Circuit's decision in Brown v. Commissioner, 873 F.3d 251 (4th Cir. 2017), Ms. Carr contends that the Law Judge's assessment of her testimony and subjective complaints is not supported by substantial evidence. Although Ms. Carr testified at the administrative hearing that she experienced totally disabling pain and discomfort prior to her date last insured, the Law Judge found that the plaintiff's statements regarding the intensity and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence of record. The Law Judge provided specific reasons for his decision to not fully credit the plaintiff's statements regarding the severity of her symptoms. The Law Judge noted that plaintiff reported performing yard work and other activities that were inconsistent with complaints of disabling symptoms and limitations. (Tr. 26). Although plaintiff testified during the

---

[3] Plaintiff does not appear to argue that the need for shoulder surgery existed prior to her date last insured. She did not undergo arthroscopic surgery on her right shoulder until December 26, 2012, nearly two years after her insured status expired. X-rays performed in November of 2010 revealed no evidence of any abnormality. (Tr. 314).

administrative hearing that her lawn was very small, she advised Dr. Crickenberger that she was responsible for mowing "about 10 acres," which required several hours. (Tr. 295). The Law Judge reasoned that, regardless of the size her yard, the fact that she was able to engage in such activity during the relevant time period suggested that her symptoms were not so severe as to preclude performance of a limited range of light work. The Law Judge also noted that the objective medical evidence, including diagnostic imaging, testing, and physical examination results, repeatedly revealed no or mild abnormalities until the month before plaintiff's date last insured. Additionally, the Law Judge emphasized that in light of the "allegations of totally disabling symptoms, one would expect to see some indication in the treatment records of restrictions placed on the claimant, yet a review of the record in this case reveals no such restrictions recommended by any treating physicians." (Tr. 27).

Upon review of the record, the court is unable to discern any error in the Law Judge's credibility findings. Unlike <u>Brown</u>, the Law Judge considered plaintiff's medical history along with her own allegations regarding the symptoms of her physical and mental impairments. The court agrees that plaintiff's allegations of totally disabling symptoms are somewhat inconsistent with the complaints documented in the treatment records, the objective findings on examination, and the relatively conservative treatment measures provided before her date last insured. Thus, the court is satisfied that substantial evidence supports the Law Judge's decision not to fully credit Ms. Carr's testimony.

In affirming the Commissioner's final decision, the court does not suggest that Ms. Carr was free of all pain and discomfort during the relevant time period. Indeed, the medical evidence confirms that plaintiff suffered from impairments that could be expected to result in subjective limitations. However, no physician suggested that Ms. Carr was totally disabled for all forms of

work or necessitated greater work-related limitations than those identified by the Law Judge.   The record simply does not include medical evidence that is consistent with totally disabling symptomatology prior to the expiration of plaintiff's insured status.   It must be recognized that the inability to work without any subjective complaints does not of itself render a claimant disabled.   See Craig, 76 F.3d at 592.   It appears to the court that the Law Judge considered all of the medical evidence, as well as all of the subjective factors reasonably supported by the record, in adjudicating Ms. Carr's claim for benefits.   Thus, the court concludes that all facets of the Commissioner's final decision are supported by substantial evidence.

As a general rule, the resolution of conflicts in the evidence is a matter within the province of the Commissioner, even if the court might resolve the conflicts differently.   Richardson v. Perales, supra; Oppenheim v. Finch, 495 F.2d 396 (4th Cir. 1974).   For the reasons stated, the court finds the Commissioner's resolution of the pertinent conflicts in the record in this case to be supported by substantial evidence.   Accordingly, the final decision of the Commissioner must be affirmed.   Laws v. Celebrezze, supra.

The Clerk is directed to send certified copies of this memorandum opinion to all counsel of record.

DATED: This 30th day of November, 2018.

_____
Senior United States District Judge